**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
PAUL DEPPENBROOK, <u>et al.</u>,        )
                                        )
      Plaintiffs,              )
                                        )
      v.                       )      Civil Action No.  11-600 (RBW)
                                        )
PENSION BENEFIT GUARANTY CORP., )
                                        )
      Defendant.               )
_____ )

**<u>MEMORANDUM OPINION</u>**

The <u>pro se</u> plaintiffs, a group of former employees of a now defunct steel product

producer, Republic Technologies International, LLC ("Republic"), seek review under the

Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2012), of agency determinations made

by the defendant, the Pension Benefit Guaranty Corporation ("PBGC"), pursuant to  the

Employment Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§

1002-1461 (2012).  <u>See generally</u> Second Amended Complaint ("Compl.").  Currently before the

Court are the parties' cross-motions for summary judgment.  Upon careful consideration of the

parties' submissions,[1] the Court concludes for the following reasons that the PBGC's motion

must be granted, and the plaintiffs' motion must be denied.

---

[1] In deciding the motions, the Court considered the following filings made by the parties in addition to those already identified:  (1) the defendant's Motion for Summary Judgment ("Def.'s Mot."); (2) the Pension Benefit Guaranty Corporation's Memorandum in Support of Summary Judgment ("Def.'s Mem."); (3) the Plaintiffs' Counter Motion for Summary Judgment ("Pls.' Mot."); (4) the Plaintiffs' Reply in Opposition to Defendant PBGC's Motion for Summary Judgment and Brief in Support of Plaintiffs' Counter Motion for Summary Judgment ("Pls.' Mem."); (5) the Defendant's Opposition to the Plaintiff's Motion and Reply ("Def.'s Reply"); and (6) the plaintiffs' Reply to Defendant's Opposition to Plaintiffs' Counter Motion for Summary Judgment and Brief in Support of Said Motion ("Pls.' Reply").

## I.  BACKGROUND

### A.  The Employment Income Security Act of 1974

The ERISA was enacted in 1974 to, among other things, "ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by termination of pension plans before sufficient funds [had] been accumulated in the plans." Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 720 (1984).  Congress's goal in enacting the ERISA was "to guarantee that 'if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." Id. (quoting Nachman Corp. v. Pension Benefit Guar. Corp., 446 U.S 359, 375 (1980)).  The ERISA is divided into three major parts.  The first details reporting and disclosure requirements, participation and vesting, funding of pension plans, fiduciary responsibilities, and administration and enforcement.  29 U.S.C. §§ 1002-1191c.  The second identifies the agencies charged with administering the ERISA, as well as the outlines procedures for doing so, and also establishes a task force.  Id. §§ 1120-1242.  The third part, which is most pertinent to this case and thus discussed in further detail below, addresses insurance for certain types of pension plans through the PBGC.  Id. §§ 1301-1461.

### B.  The Pension Benefit Guaranty Corporation

"There is established within the Department of Labor a body corporate . . . known as the Pension Benefit Guaranty Corporation." Id. § 1302(a).  The PBGC's board of directors is comprised of the Secretaries of the United States Departments of Treasury, Labor, and Commerce, with the Secretary of Labor serving as the chair of the board.  Id. § 1302(d).  The PBGC is charged with carrying out the following duties:

  (1) to encourage the continuation and maintenance of voluntary private pension
       plans for the benefit of their participants,

2

(2) to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries under plans to which this title applies, and

(3) to maintain premiums established by the corporation under [29 U.S.C. § 1306] at the lowest level consistent with carrying out its obligations under this subchapter.

29 U.S.C. § 1302(a)(1)-(3).

### C. Factual and Procedural Background

The following facts are undisputed.[2]

### 1. The Republic Technologies Shutdown and the Plan Termination Date Litigation

The plaintiffs are all former employees of Republic's now defunct Beaver Falls, Pennsylvania, facility.  Compl. ¶ 23.  Republic was the product of "a pair of mergers in 1998 and 1999."[3]  Def.'s Mem. at 3.  A combination of market conditions, high debt obligations, and deteriorating liquidity at Republic led the company to "ha[ve] difficulty meeting its financial obligations."  Id.  Thus, the "PBGC attempted to secure better funding for the [company's] [p]ension [p]lans by entering into agreements with [Republic] that would increase the level of funding."  Id. at 3-4.  As part of those efforts, "[Republic] contributed a total of $64.5 million to its [p]ension [p]lans in addition to its legally required funding contributions."  Id. at 4.

---

[2] Neither the plaintiffs nor the PBGC filed separate statements of undisputed fact.  Rather, as required by Local Civil Rule 7(h)(2), the PBGC incorporated its statement of facts into its initial memorandum, and included citations to the administrative record.  Def.'s Mem. at 3 n.7.  The plaintiffs did not include a statement of facts, but rather incorporated into their initial memorandum a section entitled "Factual Background Corrections."  Pls.' Mem. at 1-2.  Although the plaintiffs' "Factual Background Corrections" dispute the PBGC's characterization of certain facts, the plaintiffs fail entirely to cite to what in the administrative record supports their corrections.  Accordingly, the Court treats the PBGC's statement of facts as the only statement of facts not in dispute.  Cf. Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").

[3] The details of the merger can be found in Pension Benefit Guaranty Corp. v. Republic Technologies, International, LLC, 287 F. Supp. 2d 815 (N.D. Ohio 2003).

Republic was ultimately "[u]nable to meet is financial obligations," and filed for bankruptcy in 2001.[4]  Id. at 4.  After determining that the company "could not reorganize as a standalone entity and would instead have to sell its assets[,] . . . ce[ase] . . . [its] operations[,] and . . . resum[e] . . . operations [under] a new owner after the assets were sold, [Republic] issued" notices to its employees pursuant to the Worker Adjustment Retraining and Notification Act ("WARN Act"), 29 U.S.C. §§ 2101-09 (2012).  Id. at 4.  The notices stated:

> As you know, the Company filed a petition with the Bankruptcy Court last year seeking to reorganize the business.  Last week, we signed a letter of intent to sell substantially all the assets of Republic to a new company, RTI Acquisition Company.  We have filed a motion with the Bankruptcy Court to approve this transaction, subject to higher and better offers.  Some of Republic's assets are not included in the proposed transaction, including the **Beaver Falls Cold Finished** facility.  Accordingly, subject to the approval of the Bankruptcy Court, the Company plans to permanently and entire [sic] close its plant located at **220 Seventh Avenue, Beaver Falls, PA 15010**.  The expected date of first separation will be between July 17, 2002 and August 1, 2002.  A list of the job titles of positions to be affected by the plant closure and the names of workers currently holding the affected jobs is also attached hereto.  This is a formal notice pursuant to the Worker Adjustment and Retraining Notification ("WARN") Act.  The Company expressly reserves its right to invoke any exception available to it under the WARN Act should circumstances change.

Administrative Record ("AR") at 28.  "Around the same time, [Republic] negotiated an agreement with [the United Steelworkers of America Union ("United Steelworkers")] under which (i) July 9, 2002, was specified as the 'shutdown' date of [Republic] for purposes of the shutdown benefits . . . under [its] [p]ension [p]lans and (ii) [Republic] employees who otherwise met the age and service requirements would be deemed eligible for shutdown benefits."  Def.'s Mem. at 4-5.  As explained by the Sixth Circuit,

> [s]hutdown benefits are enhanced early retirement benefits for certain workers who are affected by a facility shutdown or business cessation.  They permit participants who meet certain age and service requirements to begin receiving a

---

[4] Although the PBGC lists "April 2002" as the date when Republic filed for bankruptcy, the actual filing date was April 2, 2001.  Pension Benefit Guar. Corp. v. Republic Techs., Int'l, LLC, 386 F.3d 659, 663 (6th Cir. 2004).

retirement benefit after a plant shutdown, rather than having to wait while out of work to reach a specific retirement age.  Unlike other early and normal retirement benefits, shutdown benefits usually are not advance-funded.  Because this enhanced benefit may be paid for many years before a recipient is eligible for normal retirement benefits, the cost of shutdown benefits can be very high.

Pension Benefit Guar. Corp. v. Republic Techs., Int'l, LLC, 386 F.3d 659, 662-63 (6th Cir.

2004) (footnotes omitted).

Republic filed for bankruptcy and was eventually "liquidated in . . . 2004." Def.'s Mem.

at 3.  "During that bankruptcy, [the] PBGC terminated [Republic's] four defined benefit pension

plans." Def.'s Mem. at 3.  The PBGC "had to decide whether to involuntarily terminate the

[p]ension [p]lans prior to the accrual of shutdown benefits, which would add an additional $96

million to [the] PBGC's liability," which was already "then estimated at more than $300

million." Id. at 5-6.  The "PBGC determined to terminate the plans and, on or about June 14,

2002, notified [the plans'] participants, through [United Steelworkers] and by newspaper

publication, of its intent to terminate the [p]ension [p]lans and establish June 14, 2002, as the

[p]ension [p]lans' termination date." Id. at 6.  Because disagreements arose as to "the

appropriate termination date for [Republic's] pension plans," the PBGC filed suit in the United

States District Court for the Northern District of Ohio, which set the plans' termination date as

August 17, 2002.  Pension Benefit Guar. Corp. v. Republic Techs. Int'l, LLC, 287 F. Supp. 2d

815 (N.D. Ohio 2003).  The case was appealed to the Sixth Circuit Court of Appeals, which

ultimately set the plan termination date back to June 14, 2002, as requested by the PBGC.

Republic Techs., Int'l, 386 F.3d at 668.  Among the affected Republic pension plans was "the

pension plan for hourly workers in which [the] [p]laintiffs are participants" (Republic's "Hourly

Pension Plan"). Def.'s Mem. at 5.

### 2.   The PBGC's Determination of the Plaintiffs' Benefits

Under the original August 17, 2002 plan termination date, many of the Republic pension plans' "participants became eligible to take early retirement under the shutdown benefit provisions . . . and did in fact retire."  Def.'s Mem. at 7.  As a result, when the Sixth Circuit set the date two months earlier, to June 14, 2002, "many participants suddenly became ineligible for certain benefits that they had in fact received during the prior two years under the district court's chosen termination date."  Id.  The "PBGC gave [affected] participants the option of continuing to receive pension benefits . . . , or rescinding their retirement and deferring their pensions until they reached their normal retirement age.  [The] [p]laintiffs chose the latter option."  Id. at 7-8 (footnotes omitted).

### 3.   The Plaintiffs' Administrative Appeals and the Current Lawsuit

Upon receiving the PBGC's benefit determinations, each plaintiff filed a timely appeal alleging, among other things, that the PBGC should treat the May 1, 2002 WARN Act notice as the date of constructive shutdown, and that it had "mishandled" the plaintiffs' defined contribution plan accounts which the plaintiffs had carried over from pre-merger pension plans.  Id. at 8-10; AR at 642, 741, 854, 953.  The PBGC Appeals Board rejected each of the appeals.  AR at 3, 91, 177, 262.  Following that denial, the plaintiffs initiated this lawsuit, requesting administrative review of the alleged "delays, wrongful reductions, and improper pension calculations by the [d]efendant who fraudulently altered and changed the pension agreement."  Compl., Prayer For Relief.  The parties have now filed cross motions for summary judgment.

## II.  STANDARD OF REVIEW

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  "Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review."  Loma Linda Univ. Med. Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citing Stuttering Found. of Am. v. Springer, 498 F. Supp. 2d 203, 207 (D.D.C. 2007)); see also Richards v. INS, 554 F.2d 1173, 1177, 1177 n. 28 (D.C. Cir. 1977).  But due to the limited role a court plays in reviewing the administrative record, the typical summary judgment standards set forth in Rule 56(c) are not applicable.  Stuttering, 498 F. Supp. 2d at 207.  Rather, "[u]nder the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'"  Id. (quoting Occidental Eng'g Co. v. INS, 753 F.2d 766, 769 (9th Cir. 1985)).  In other words, "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of law."  Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote and citations omitted).

The APA provides a "default standard" of judicial review of agency actions when a statute does not otherwise provide one:  "A court must set aside agency action it finds to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Tourus Records, Inc. v. DEA, 259 F.3d 731, 736, 736 n. 10 (D.C. Cir. 2001) (quoting 5 U.S.C. § 706(2)(A)).  "The 'arbitrary and capricious' standard of review as set forth in the APA is highly deferential," and the Court must therefore "presume the validity of agency action."  Am. Horse Prot. Ass'n v. Yeutter, 917 F.2d 594, 596 (D.C. Cir. 1990).  Although the "court is not to substitute its judgment for that of the agency[,] . . . the agency must examine the relevant data

and articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983) (citations and quotation marks omitted).

Where a plaintiff is proceeding <u>pro se</u>, "the Court must take particular care to construe the plaintiff's filings liberally, for such complaints are held 'to less stringent standards than formal pleadings drafted by lawyers.'" <u>Cheeks v. Fort Myers Constr. Co.</u>, 722 F. Supp. 2d 93, 107 (D.D.C. 2010) (quoting <u>Haines v. Kerner</u>, 404 U.S. 519, 520-21 (1972))

## III.  LEGAL ANALYSIS

### A.  The PBGC's Calculations of the Plaintiffs' Shutdown Benefits

The PBGC contends that it correctly calculated the plaintiffs' benefits because "[t]he record clearly shows that [the p]laintiffs were simply not entitled to a shutdown benefit." Def.'s Mem. at 15.  Under the PBGC's regulations,

> the PBGC will guarantee the amount, as of the termination date [of a pension plan], of a benefit provided under a plan to the extent that the benefit does not exceed the limitations in ERISA and in subpart B if --
> (1) The benefit is, on the termination date, a nonforfeitable benefit;
> (2) The benefit qualifies as a pension benefit as defined in § 4022.2; and
> (3) The participant is entitled to the benefit under § 4022.4.

29 C.F.R. § 4022.3.  In other words, the PBGC will guarantee a plan benefit if (1) the plan participant has satisfied the plan's requirements for receiving benefits on the date that the plan is terminated, 29 U.S.C. § 1301(a)(8); 29 C.F.R. § 4001.2; (2) the benefit is "payable as an annuity . . . which . . . provide[s] a substantially level income to the recipient," 29 C.F.R. § 4022.2; and, as relevant here, (3) "under the provisions of [the] plan . . . [and] before the termination date . . . [,] the participant had satisfied the conditions of the plan necessary to establish the right to receive the benefit prior to such date," 29 C.F.R. § 4022.4(a)(3).  The regulations plainly mandate that the PBGC must

guarantee only those benefits the plaintiffs were entitled to receive under the plan's requirements for the receipt of that particular benefit, and only if those requirements were satisfied <u>before</u> the plan was terminated.

Here, Article 4 of Republic's Hourly Pension Plan, titled "Eligibility for Benefits," AR at 383-88, outlines the requirements that must be satisfied to be eligible for benefits.  The plaintiffs do not dispute, Pls.' Mem. at 14, that under Article 4, the two applicable sections are § 4.06, concerning "70/80 Retirement," AR at 385-86, and § 4.07, concerning "Rule-of-65 Retirement," AR at 386-87.  Section 4.06 provides that "[a]ny Participant who has not attained the age of 62 years and who shall have had at least 15 years of Continuous Service" is eligible for a pension upon retirement if that Participant also "incurs a Break in Continuous Service by reason of a permanent shutdown of a plant, department or subdivision thereof" if (a) the Participant is over "the age of 55 years and [his or her] combined age and years of Continuous Service . . . equal 70 or more," or (b) the Participant is under the age of 55 and his or her "combined age and years of Continuous Service . . . equal 80 or more."  AR at 385-86.  And § 4.07 provides that "[a]ny Participant who has not attained the age of 55 years and who shall have had at least 20 years of Continuous Service as of his last day worked" is eligible for a pension upon retirement if (a) the Participant's "combined age and years of Continuous Service . . . equal 65 or more, but less than 80," and (b) the Participant "is absent from work by reason of a layoff resulting from . . . a permanent shutdown."  AR at 386-87.

The PBGC contends that

[t]he Administrative Record clearly shows that . . . [a]lthough each [p]laintiff appears to have satisfied the age and service requirements, none of them underwent the requisite break in continuous service prior to the [Hourly] Pension

Plan's termination date of June 14, 2002.  Their employment at the Beaver Falls facility continued through the middle of August 2002.

Def.'s Mem. at 16.  The Court finds that the Administrative Record supports the PBGC's determination.

As to plaintiff Paul Deppenbrook, the PBGC conceded that he "met the age and service requirements for a Rule-of-65 benefit before the [Hourly Pension] Plan terminated." AR at 3. However, in order to have been eligible for a benefit guaranteed by the PBGC, the benefit must have been nonforfeitable.  29 U.S.C. § 1301(a)(8); 29 C.F.R. § 4001.2; id. § 4022.3.  Stated differently, the requirements for a PBGC guaranteed benefit must have been met prior to the date on which the pension plan terminated.  By definition, shutdown benefits would not have become nonforfeitable until the date of the plant shutdown.  Republic Techs., Int'l, 386 F.3d at 664.  In Mr. Deppenbrook's case, the Sixth Circuit determined the plan termination date to be June 14, 2002,  id., whereas the PBGC had evidence from "data . . . obtained from [Republic,]" as well as from "a telephone interview with the former Plant Manager[,] that the Beaver Falls facility was not shutdown until mid-August of 2002."  AR at 4.  Indeed, employment records provided by Republic to the PBGC show that Mr. Deppenbrook's last day of work was August 16, 2002.  AR at 671.

As to plaintiff Arthur Evans, Jr., the PBGC conceded that he "met the age and service requirements for a Rule-of-65 benefit before the [Hourly Pension] Plan terminated."  AR at 3. However, as with Mr. Deppenbrook, the PBGC had evidence from Republic records and from a phone interview that the Beaver Falls facility where Mr. Evans worked remained open past the Hourly Pension Plan's termination date.  AR at 95-96.  And although employment records for Mr. Evans are not contained in the Administrative Record, there is a handwritten notation on his

appeal of the initial PBGC determination indicating that his last day of work was on or around August 16, 2002.  AR at 751.

The PBGC found that plaintiff Ronald Gossard also "met the age and service requirements for a Rule-of-65 benefit before the [Hourly Pension] Plan terminated."  AR at 180. Again, however, there was evidence that the Beaver Falls facility remained open and Mr. Gossard continued to work until mid-August 2002, which was well past the June 14, 2002 termination date of the Hourly Pension Plan.  AR at 181-82.  Further, the Administrative Record contains employment records indicating that Mr. Gossard applied on September 10, 2002, for retirement as of August 16, 2002.  AR at 880.

Finally, as to plaintiff William Venezie, the PBGC found that he "met the age and service requirements for a 70/80 benefit before the [Hourly Pension] Plan terminated."  AR at 265.  But as with the other plaintiffs, the PBGC had evidence that Mr. Venezie's final day of employment was August 16, 2002.  AR 266-67.  And the Administrative Record contains evidence that he applied on September 9, 2002, for retirement as of August 16, 2002.  AR at 1009.

As discussed above, the Administrative Record supports the PBGC's determination that none of the plaintiffs experienced a break in continuous service until after the Hourly Pension Plan was terminated, and that they thus did not meet the requirements for shutdown benefits. Because the evidence in the record provided a reasonable basis for the PBGC to deny shutdown benefits to the plaintiffs, the Court finds that the PBGC's determination was not arbitrary or capricious.

The plaintiffs argue for many reasons that May 1, 2002, the date of the WARN Act notice, should be considered the shutdown date with respect to the Beaver Falls facility.  Pls.'

11

Mem. at 3-8.  However, the plain language of the WARN Act notice makes clear that, as of May 1, 2002, the shutdown was not yet a certainty:

> [Republic] <u>plans</u> to permanently and entire[ly] close its [Beaver Falls facility] . . . The <u>expected</u> date of first separation will be between July 17, 2002 and August 1, 2002. . . . [Republic] expressly reserves its right to invoke any exception available to it under the WARN Act <u>should circumstances change</u>.

AR at 28 (emphasis added).  And even if the notice set a date certain for the shutdown, the earliest such date was July 17, 2002—more than one month after the plan termination date designated by the Sixth Circuit.

Regardless, and as discussed above, there is ample evidence in the Administrative Record that the Beaver Falls facility did not actually close until after the Hourly Pension Plan was terminated.  Republic's Hourly Pension Plan provides for shutdown benefits when there has been a break in continuous service, and enumerates various circumstances that would constitute such a break.  AR at 375-77.  Notably absent from this list of circumstances constituting a break in continuous service is an <u>expected</u> shutdown.  Given the uncertainty at the time the anticipated shutdown notice was issued regarding the date when Republic would actually close the facility, as well as the affirmative evidence in the Administrative Record that the facility did not close until August 16, 2002, the Court finds that the PBGC's determination to not use May 1, 2002, as the eligibility date for shutdown benefits for employees of the Beaver Falls facility was not arbitrary, capricious, or an abuse of discretion.

The plaintiffs contend in the alternative that the waiting period outlined in the WARN Act should be read together with the ERISA waiting period discussed in the definition of "nonforfeitable benefits," such that the plant shutdown condition should be deemed the beginning of the WARN Act waiting period.  Pls.' Mem. at 5-7.  The PBGC disagrees, arguing

that "the 60-day notice under the WARN Act is not a 'waiting period' for purposes of guaranteed benefits under [the] ERISA."  Def.'s Reply at 4-5.

As noted earlier, the "PBGC's interpretation of [the] ERISA is entitled to great deference."  Belland v. Pension Benefit Guar. Corp., 726 F.2d 839, 843 (D.C. Cir. 1984).  But "[i]f the statutory language 'is plain and admits of no more than one meaning, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion.'"  Id. (citation omitted).  Here, while the plaintiffs are correct that the WARN Act requires employers to notify their employees 60 days prior to closing a plant, 29 U.S.C. § 2102(a), the plain language of the ERISA makes clear that the WARN Act waiting period is distinct from the waiting period contained in the ERISA's definition of nonforfeitable benefits. As discussed above, the ERISA defines a nonforfeitable benefit as one "for which a participant has satisfied the conditions for entitlement under the plan or the requirements of this chapter (other than . . . completion of a required waiting period . . .) . . . ."  29 U.S.C. § 1301(a)(8).  The plain language of the statute refers to requirements under a pension plan or under "requirements of this chapter," that is, Chapter 18 of Title 29.  Chapter 18, in turn, encompasses the ERISA. The parenthetical following the phrase "under the plan or the requirements of this chapter" modifies the phrase to exclude certain plan and ERISA requirements, such as plan waiting periods and Chapter 18 (i.e., the ERISA) waiting periods.  Id.  The WARN Act is not part of the Republic Hourly Pension Plan.  And the WARN Act itself, and any waiting periods referenced therein, are part of Chapter 23 of the Title 29, and not part of Chapter 18.  29 U.S.C. §§ 2101-2209.

The PBGC's interpretation of a "nonforfeitable benefit" as contemplating only waiting periods under the ERISA or under the pension plan at issue is consistent with the purposes of the

PBGC.  These purposes include, among others, "provid[ing] for the timely and uninterrupted

payment of pension benefits to participants and beneficiaries under plans to which this

subchapter applies."  29 U.S.C. § 1302(a)(2).  Because the PBGC's interpretation of

"nonforfeitable benefits" here is consistent with paying "pension benefits . . . under plans to

which this subchapter applies," id. (emphasis added), as opposed to under other statutes or

documents, and because the interpretation comports with the statute's plain language, the Court

finds that the PBGC's interpretation is not arbitrary, capricious, or an abuse of discretion.[5]  See

Belland, 726 F.2d at 843-44 (holding that the PBGC's interpretation of the ERISA was

permissible where the interpretation "adhered to an express statutory purpose and complied with

the statute's plain language").

###    B.  The PBGC's Decision to Insure only Defined Benefit Plans

The plaintiffs also accuse the PBGC of allowing the Hourly Pension Plan to become

underfunded, of wrongly "refus[ing] to insure the individual accounts" that comprise certain

portions of the Plan, and of failing to adhere to the terms of the plaintiffs' union's collective

bargaining agreement.  Pls.' Mem. at 10-12.  The plaintiffs further argue that the PBGC

improperly ignored a particular adjustment contained in § 5.03(a) of the Hourly Pension Plan.

Id. at 15-18.

---

[5] The plaintiffs advance other arguments concerning the WARN Act.  First, they argue that the Hourly Pension Plan was "amended retroactively on the basis of the WARN Act legislation," and that the PBGC failed to notify the Plan's participants of the amendment, in violation of the terms of the Plan.  Pls.' Mem. at 8-9.  As the PBGC correctly notes, Def.'s Reply at 5, this argument is not helpful to the plaintiffs because they fail to address how such an amendment would affect the shutdown date.  Further, the WARN Act, by its very terms, does not purport to alter the plaintiffs' rights under the ERISA or under the Hourly Pension Plan.  29 U.S.C. § 2105 (stating that the WARN Act's "rights and remedies . . . are in addition to, and not in lieu of, any other contractual or statutory rights . . . and are not intended to alter or affect such rights and remedies").  Second, the plaintiffs argue that the PBGC should have used May 1, 2002, as the shutdown date because Republic "could have ignored the [l]aw and closed the Beaver Falls facility instantly."  Pls.' Mem. at 7.  This argument must be rejected.  The plaintiffs' suggestion assumes that a company is free to ignore the law, and that other entities can and should rely on that assumption, neither of which is the case.  In any event, none of the plaintiffs' WARN Act arguments affect the Court's conclusion that the PBGC's determination with respect to the plaintiffs' shutdown benefits was not arbitrary, capricious, or an abuse of discretion.

The PBGC argues that its calculation of the plaintiffs' benefits is correct because the PBGC properly administered only the portion of the Hourly Pension Plan that it is legally permitted to insure—namely, the portion comprising the plaintiffs' defined benefit plan and not their individual defined contribution plans that had been carried over from the merger that created Republic.  Def.'s Mem. at 15, 17-18.

"In enacting [the] ERISA, Congress distinguished between two types of employee benefit plans: 'defined benefit plan[s]' and 'defined contribution plan[s],' also known as 'individual account plan[s].'"  Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 229 (1986) (quoting 29 U.S.C. §§ 1002(34), (35)).  And under the statute, the PBGC's "coverage . . . continues to turn on whether [a plan] is a defined benefit plan" because the "ERISA . . . exempt[s] . . . defined contribution plans, narrowly defined, from PBGC coverage."  Id. at 231.  Further, the PBGC is limited to assuming the role of trustee with respect to underfunded defined benefit plans that have been terminated.  29 U.S.C. §§ 1322, 1342(c).

There is no dispute that certain portions of the plaintiffs' benefits arise out of one of Republic's four defined benefit plans, and that others arise out of the plaintiffs' individual defined contribution plans.  Rather, the plaintiffs assert that the "PBGC has refused to insure the individual accounts as required by [the] ERISA."  Pls.' Mem. at 10.  This position is devoid of statutory support.  As the Supreme Court made clear, the PBGC cannot provide coverage for defined contribution plans.  Connolly, 475 U.S. at 230-31.  Accordingly, the Court finds that the PBGC's decision to administer and insure only the plaintiffs' defined benefit plan was not arbitrary, capricious, or an abuse of discretion.

While the plaintiffs are correct that the Republic merger and the subsequent amendments to the Hourly Pension Plan combined defined contribution plans with defined benefit plans, Pls.'

Mem. at 10-11; Def.'s Mem. at 17, it is not the case that the mere combination of the plans created an obligation that the PBGC insure the entirety of the combined plan.  The plaintiffs and the PBGC agree that the combined plan, the Hourly Pension Plan, comprised a "floor offset" plan under 26 U.S.C. § 414(k), a fact supported by the Administrative Record.  AR at 567-73. Section 414(k) states only that the portion of the Hourly Pension Plan derived from an employee's individual account will, for ERISA purposes, continue to be treated as a defined contribution plan.  26 U.S.C. § 414(k); Berger v. Nazametz, 157 F. Supp. 2d 998, 1010 (S.D. Ill. 2001) (observing that § 414(k) requires that defined contribution funds be "maintained in a separate account and not be considered for purposes of compliance with the defined benefit rules").  As discussed above, the PBGC is prohibited from administering or insuring defined contribution plans.

The plaintiffs concede that the "PBGC is correct that the benefit is to be offset" by the amount distributed from an individual employee's individual account, Pls.' Mem. at 15-16, but make much of the fact that certain defined contribution plans were transferred to one of Republic's defined benefit plans as a result of the merger, id. at 18.  They argue that the "PBGC has forced the plan participants to take a distribution[, despite the fact that the] [p]laintiffs were to have a choice to these elections of distribution and this has decreased their 'Protected Benefit' under the terms of the plan."  Id. (footnote omitted).  The PBGC counters that "each [p]laintiff received a lump-sum distribution of the amount in his individual account, which represented the 'accrued benefit' of the [defined contribution plan] account."  Def.'s Reply at 12 (citing Tres. Reg. § 1.411(a)-(7)(a)(2)).  The Hourly Pension Plan, in turn, directs that the amount that a plan participant receives under the defined benefit plan must be offset by the amount of the lump sum.

AR at 456-57.  Accordingly, the PBGC did not arbitrarily or capriciously decrease the plaintiffs'

benefits under the Hourly Pension Plan.[6]

The plaintiffs argue also that the PBGC's treatment of the defined contribution plans

constituted an unlawful amendment to the Hourly Pension Plan, in violation of 26 U.S.C. §

411(d)(6) and 29 U.S.C. § 1054(g).  Pls.' Mem. at 25.  These provisions of the Internal Revenue

Code and the ERISA, commonly called the "Anti-Cutback Rule," "bar ERISA-covered benefit

plans from enacting most amendments that would decrease participants' accrued benefits."

Virtue v. Int'l Bhd. of Teamsters Ret. & Family Prot. Plan, __ F. Supp. 2d __, __, 2013 WL

1769804, at *3 (D.D.C. 2013).  Here, however, the PBGC did not amend the Hourly Pension

Plan by requiring that the plaintiffs receive a distribution of the amounts in their defined

contribution plans upon the termination of the Hourly Pension Plan, or by requiring that the

plaintiffs' defined benefit plan amount be offset by the amount of the distribution received under

their individual defined contribution plans.  Rather, the distributions and subsequent offsets were

already required by the terms of the Hourly Pension Plan.  See AR at 392, 456-57.

The plaintiffs argue that 29 U.S.C. § 1321, which they contend "clearly describes plans

covered by the PBGC pension insurance program, as well as those plans that are excluded from

coverage," requires the PBGC to provide coverage of their defined contribution plans.  Pls.'

Mem. at 22-25.  However, § 1321(b) explicitly excludes from PBGC coverage "individual

---

[6] Nor did the PBGC force the plaintiffs to receive their defined contribution plan distributions as a lump sum.
Rather, a letter was sent to each plaintiff explaining that he had a choice to receive the distribution from his defined
contribution plan as either a lump sum or an annuity.  AR at 87-90,173-76, 258-61, 342-45.  If the plaintiffs mean to
argue that they should not have been required to receive any distributions at all because the Hourly Pension Plan
constituted a single defined benefit plan, then the plaintiffs misapprehend the nature of the plan as explained in the
Administrative Record, AR at 567-73, as well as the PBGC's statutory obligation.  The Administrative Record
indicates that the Hourly Pension Plan was a § 414(k) floor offset plan, i.e., one comprised of defined contribution
components and defined benefit components.  Id.  As discussed above, the PBGC is prohibited from administering
or insuring defined contribution plans.  Accordingly, the PBGC preserved the plaintiffs' rights as to their defined
contribution plans by having a third party administer the plans.  Id.  The PBGC cannot be at fault for the manner in
which the defined contribution plans were administered, as it did not, in fact, administer them.

account plan[s], as defined in paragraph (34) of section 1002." 29 U.S.C. § 1321; see also Connolly, 475 U.S. at 230-31.

Finally, the plaintiffs argue that the PBGC ignored a particular adjustment contained in § 5.03(a) of the Hourly Pension Plan. Pls.' Mem. at 15-16.  In particular, the plaintiffs believe that they are entitled under that provision to an increase in their monthly benefit payments. Id. (citing §§ 5.03(a), 5.04(c), 5.05(g) of the Hourly Pension Plan).  The Hourly Pension Plan states that certain increases are available to plan participants only if they are not "eligible for an unreduced . . . [b]enefit." AR at 394-99 (emphasis added).  "The monthly amount of any Regular Pension shall be equal to a monthly benefit of $35.00 . . . multiplied by" the number of years of service. Id. at 392.  And Appendix A to the Hourly Pension Plan explicitly states that a plan participant's benefits are equal to the "Individual Account Benefit . . . and . . . a defined benefit pension determined in accordance with Article 5 of the [Hourly Pension] Plan." Id. at 451.  As explained by the PBGC Appeals Board, the plaintiffs ultimately each received full benefits by virtue of "the combination of the [individual account] benefit, the [Republic] defined benefit," and additional benefits such that each plaintiff ultimately received the equivalent of "$35 multiplied by [his] years of Continuous Service." Id. at 11, 100, 186, 271.  Further, the PBGC Appeals Board stated that it "examined the files of numerous participants who retired before [the] PBGC became trustee [and that i]n every file [it] . . . reviewed, the Prior Plan Administrator" had administered retiree benefits in the same manner. Id. at 11, 100, 187, 271.  Because the plaintiffs were ultimately receiving full, unreduced benefits, the Court finds that the PBGC's decision not to increase the plaintiffs' benefits in accordance with § 5.04(a) of the Hourly Pension Plan was not arbitrary or capricious.

## IV.  CONCLUSION

For the foregoing reasons, the Court grants the PBGC's motion for summary judgment and denies the plaintiffs' cross motion for summary judgment.[7]

**SO ORDERED** this 17th day of June, 2013.

REGGIE B. WALTON
United States District Judge

---

[7] The Court will contemporaneously issue an Order consistent with the Memorandum Opinion.